J-S17005-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| v. | : |
| JACOB HOLMES, JR. | : |
| Appellant | : No. 2124 EDA 2025 |

Appeal from the PCRA Order Entered July 8, 2025
In the Court of Common Pleas of Northampton County
Criminal Division at No(s): CP-48-CR-0003514-2017

BEFORE:   LAZARUS, P.J., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED AUGUST 3, 2026**

Jacob Holmes, Jr. appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. Holmes asserts the PCRA court erred in finding his two trial counsel were not ineffective. After careful review, we affirm on the basis of the well-reasoned opinion of the PCRA court.

We previously summarized the factual and procedural history of this case, during Holmes's direct appeal from his judgment of sentence, as follows:

> On the evening of March 30, 2009, Easton police responded to a report of a shooting at the Easton Cafe. Upon arrival, the police found Miguel Aponte ("the victim") laying on the floor of the bar, deceased. A forensic pathologist determined that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide. Witnesses on scene recalled seeing

_____

[*] Retired Senior Judge assigned to the Superior Court.

Franklin Barndt, a white male, twice entering the bar, looking around, and leaving, shortly before the shooting. Moments after Barndt's second exit[,] someone knocked on the locked back door near where the victim was seated. The bartender opened the door to find a light-skinned black man with a face mask and a gun who immediately opened fire on the victim. The victim was shot seven times at close range. No other patrons were injured before the shooter fled the area.

While Barndt's skin color meant that he was not the shooter, Barndt's suspicious behavior led officers to believe he was associated with the shooter. In addition to witnesses identifying Barndt, his cell phone records placed him in the area of the Easton Cafe before and during the shooting. Barndt admitted he was at the Easton Cafe that night, but initially claimed that he left the area forty-five minutes before the shooting and walked to the Brick House Tavern, which was several miles away. Barndt's paramour[,] Raquel Meyer[,] confirmed Barndt's movements, explaining that she had picked Barndt up from the Brick House Tavern.

However, months later, Meyer provided a second, more detailed statement, explaining that Barndt had summoned her to the Brick House Tavern to pick him up, instructed her to come alone, and that [Holmes] had entered the vehicle with Barndt. Both men were "hyped up" and she overheard Barndt trying to convince [Holmes] of her trustworthiness. The next morning[,] Meyer drove Barndt to a nearby park and watched as he threw a firearm into the Delaware River. Alarmed by this development, Meyer questioned Barndt about the firearm, but he told her to "mind [her] business." After the second interview, Meyer moved to Puerto Rico, "fearing what could happen from this." Meyer's cell phone records confirmed that she was at home when the homicide occurred. A recovery service searched the river, but the firearm was never found.

Meanwhile, officers discovered that[,] in 2006[, Holmes] was shot and wounded when his best friend, Jason Oliver, was shot to death by John Logan, an associate of the victim. [Holmes] initially told officers at the hospital that he did not know who the shooter was, but that "he would recognize him, and if he sees him[,] he'll get him." Later, [Holmes] identified Logan as the shooter and the victim as his associate. Logan was arrested and pled guilty to homicide, receiving a sentence of twenty to forty years of

incarceration. The victim was also arrested and charged with criminal homicide. However, after [Holmes] testified at the victim's preliminary hearing, the victim pled guilty to carrying a firearm without a license and received a sentence of two and one-half to five years of incarceration. On December 31, 2008, the victim was released from incarceration. He was killed less than ninety days later.

In 2010, [Holmes] agreed to speak with police about the Easton Cafe [homicide], but denied involvement, claiming he was "home all night." [Holmes] admitted that he knew Barndt but denied calling or hanging out with him the night of the Easton Cafe homicide. However, [Holmes's] phone records contradicted his statements, revealing that he had exchanged several calls with Barndt before and after the shooting, was in the vicinity of the Easton Cafe at the time of the shooting, and moved in concert with Barndt in its immediate aftermath.

Due to difficulties in obtaining witness cooperation, the [D]istrict [A]ttorney's [O]ffice convened three separate investigating grand juries pertaining to the Easton Cafe homicide. When Barndt heard that Meyer was returning from Puerto Rico to testify at the grand jury proceeding, he absconded from his boot camp assignment at Rockview State Prison, where he was serving time on an unrelated conviction. Barndt was captured a couple hours later, returned to prison, and charged with escape. Meyer testified before the grand jury consistently with the statement she made during her second interview. Barndt also testified before the grand jury, for the first time[,] identifying [Holmes] as the shooter, but denying any involvement in the shooting. During his testimony before the second grand jury, Barndt admitted that he entered the vehicle with [Holmes] after the shooting.

Meanwhile, on April 30, 2012, Megan Fenar, [Holmes's] former paramour, went to the Easton Police Department to make a report in an unrelated matter. While there, Fenar informed police that she had information about a murder and revealed that [Holmes] admitted to her that he killed the victim. [Holmes] had also told Fenar that his friend Barndt was there and that a woman had acted as their driver. [Holmes] expressed confidence that he would get away with the homicide because the woman had moved to Puerto Rico.

In December of 2013, Barndt was arrested and pled guilty to conspiracy to commit murder with [Holmes] and related charges for the death of the victim. The same day, Barndt also pled guilty to terroristic threats due to threats he had made to kill law enforcement officers involved in the investigation of this shooting. Barndt was sentenced to an aggregate sixteen to forty-two years of incarceration for his role in the victim's homicide.

On March 15, 2016, Barndt requested a meeting with law enforcement through his attorney. During the meeting, Barndt revealed for the first time the full extent of his involvement in the homicide. Barndt explained that he received multiple calls from [Holmes] on the evening of March 30, 2009, during which they discussed the victim's presence at the Easton Cafe. After [Holmes] repeatedly stated that he wanted to kill the victim[,] and Barndt confirmed his location in the bar, the two met up in a parking lot near the Easton Cafe, exchanging clothing and a firearm. Together they approached the side door to Easton Cafe before [Holmes] entered the bar and repeatedly fired at the victim while Barndt remained outside. Afterwards, [Holmes] returned the firearm to Barndt[,] and they fled to the Brick House Tavern together in [Holmes's] vehicle. Barndt admitted to driving the getaway vehicle and took officers to the location where he disposed of the firearm the next day, matching Meyer's earlier description.

In August of 2017, Easton police officers arrested [Holmes] and charged him with criminal homicide, criminal conspiracy to commit criminal homicide, recklessly endangering another person, and carrying a firearm without a license. Thereafter, the Commonwealth filed a notice of intent to seek the death penalty.

In 2018, [Holmes] filed an omnibus pretrial motion, requesting, among other claims, a change of venue or venire due to pretrial publicity. After a change of counsel, [Holmes] filed a supplemental motion raising the same issues. On March 23, 2018, the trial court held a hearing on the pretrial motions. Following the hearing, [Holmes] filed a second supplemental omnibus pretrial motion, attaching various media articles. On April 11, 2018, the trial court issued an order and opinion. The court included additional media articles that [Holmes] had not provided, concluded that [Holmes's] pretrial publicity claims were "overstated," and denied the motion without prejudice. Over the next two years, [Holmes] and the Commonwealth continued to litigate various pretrial motions[…], [addressing, *inter alia*,] the admissibility of the jail

- 4 -

house confession [Holmes] made to the brother of Jason Oliver, the victim from the 2006 shooting.

…

On December 8, 2020, [Holmes] proceeded to the guilt phase of his death penalty jury trial [following continuances based on the Covid-19 pandemic]. At trial, multiple witnesses described the shooter as someone matching [Holmes's] description, but only Barndt identified [Holmes] as the shooter and detailed his involvement in the planning and flight from the shooting. [Holmes's] former paramour also testified that [Holmes] had bragged about killing the victim, explaining the only way he could "go down for what happened [was] if this woman would come back from Puerto Rico." Finally, Brian Oliver testified that [Holmes] had approached him in prison on the fourteenth anniversary of his brother's murder, hugged him, and told him that he had "handled my business, I could not let it ride."

On December 15, 2020, the jury convicted [Holmes] of first-degree murder and criminal conspiracy to commit first-degree murder. Thereafter, the jury was dismissed following the penalty phase of [Holmes's] trial because it could not unanimously agree to impose the death penalty. On April 28, 2021, the trial court imposed a sentence of life imprisonment without the possibility of parole for first-degree murder, followed by a consecutive fifteen to thirty years of incarceration for the criminal conspiracy conviction. [Holmes] filed a timely post-sentence motion and supplemental post-sentence motion, which were denied.

***Commonwealth v. Holmes***, 2023 WL 3068617, at *1-5 (Pa. Super., filed April 25, 2023) (2055 EDA 2021) (unpublished memorandum) (record citations omitted). We affirmed Holmes's judgment of sentence on direct appeal.[1] ***See id.*** at *9.

_____

[1] On direct review, Holmes raised claims unrelated to the issues addressed in the instant appeal; he challenged the denial of his pre-trial requests for

*(Footnote Continued Next Page)*

On April 25, 2024, Holmes filed the instant timely PCRA petition, raising numerous claims of ineffective assistance of trial counsel. Following a PCRA issue-framing conference, Holmes submitted supplemental witness affidavits to support his petition.

On October 31, 2024, the PCRA court held an evidentiary hearing, at which trial counsel and the witnesses who had provided affidavits testified. In its opinion, the PCRA court set forth a thorough and accurate summary of the extensive testimony provided. *See* PCRA Court Opinion, 7/8/25, at 23-52. We, therefore, have no reason to restate the summary of that testimony here.

During the hearing, issues arose as to Holmes's Fifth Amendment privilege against self-incrimination. The court continued the remainder of the hearing and ordered the parties to submit briefs regarding Holmes's right to remain silent at a PCRA hearing.

On December 6, 2025, the PCRA court resumed the evidentiary hearing. Following the completion of the hearing, and at the court's direction, the parties filed briefs in support of their respective positions regarding Holmes's PCRA claims. The PCRA court subsequently entered an order denying the PCRA petition. This timely appeal followed. Both Holmes and the PCRA court complied with Pennsylvania Rule of Appellate Procedure 1925. *See* Pa.R.A.P.

_____

continuances and his motion for a change of venue/venire. ***See Holmes***, 2023 WL 3068617, at *5-9.

1925(a), (b).

Holmes raises the following issues on appeal:

1. Whether the PCRA court erred in dismissing the claim that trial counsel were ineffective for failing to interview witnesses and assert an alibi defense on behalf of [Holmes]?

2. Whether the PCRA court erred in dismissing the claim that trial counsel were ineffective for failing to object to the following Commonwealth statements at trial:

   a. The Commonwealth's assurance to the jury that gun violence could be ended forever if [it] convicted [Holmes] of first-degree murder; and

   b. The Commonwealth's disclosure to the jury, through opening statements and direct examination of the witness, that Franklin [Barndt], Jr., plead[ed] guilty to conspiracy to commit murder with [Holmes?]

3. Whether the PCRA court erred in dismissing the claim that trial counsel were ineffective for failing to interview or call members of [Holmes's] family as witnesses who would have testified that the cellular phone number in question was not [Holmes's] but belonged to a phone that was used by many members of [Holmes's] family[?]

4. Whether the PCRA cour[t] erred in dismissing the claim that trial counsel were ineffective for failing to object to hearsay testimony elicited by the Commonwealth to prove the cellular phone number in question belonged to [Holmes]?

Appellant's Brief, at 2-3 (unnecessary capitalization and suggested answers omitted).

All of Holmes's claims challenge the dismissal of his PCRA petition. Our Supreme Court has explained the appellate PCRA standard of review as follows:

- 7 -

> When reviewing the denial of PCRA relief, we must determine whether the PCRA court's factual findings are supported by the record, and whether its conclusions of law are free from legal error. Our scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party. Although we are bound by credibility determinations, we apply a *de novo* standard of review to legal conclusions.

***Commonwealth v. Clancy***, 192 A.3d 44, 63 (Pa. 2018) (citations omitted).

On appeal, Holmes contends the PCRA court erred in denying his PCRA petition where trial counsel were ineffective for failing to: (1) interview alibi witnesses; (2) object to the Commonwealth's statements at trial; (3) call witnesses regarding Holmes's cellphone; and (4) object to hearsay testimony regarding whether the cell phone number belonged to Holmes.

We presume counsel is effective, and an appellant bears the burden to prove otherwise. ***See Commonwealth v. Bennett***, 57 A.3d 1185, 1195 (Pa. 2012). The test for ineffective assistance of counsel is the same under both the Federal and Pennsylvania Constitutions. ***See Strickland v. Washington***, 466 U.S. 668, 687-88 (1984); ***Commonwealth v. Kimball***, 724 A.2d 326, 330-332 (Pa. 1999). An appellant must demonstrate: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different. ***See Commonwealth v. Solano***, 129 A.3d 1156, 1162-63 (Pa. 2015). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. ***See id.*** at

1163. "[B]oilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." ***Commonwealth v. Sandusky***, 203 A.3d 1033, 1044 (Pa. Super. 2019) (citation omitted). In any event, it is well settled that "counsel cannot be deemed ineffective for failing to raise a meritless claim." ***Commonwealth v. Treiber***, 121 A.3d 435, 445 (Pa. 2015) (citation omitted).

The PCRA court's opinion methodically and accurately details the law and facts surrounding ineffective assistance of counsel and each individual claim Holmes raised. We therefore see no reason to fully restate them here.

After a thorough review of the record, the briefs of the parties, applicable law, and the comprehensive opinion of the Honorable Michael J. Koury, dated July 8, 2025, we conclude there is no merit to Holmes's claims. ***See*** PCRA Court Opinion, 7/8/25, at 52-104. The PCRA court thoughtfully analyzed all of Holmes's issues, which we have summarized as follows:

- **Alibi Witnesses**: Finding trial counsel's testimony credible, the court concluded: (1) Holmes's claim lacks arguable merit because trial counsel relied on the information and conclusions obtained from a private investigator; (2) trial counsel explained Holmes's alibi was not credible based on information obtained from the private investigator and photographs; (3) trial counsel testified that he discussed with Holmes that an alibi was not

Holmes's best defense at trial, and based on trial counsel's reasoning and testimony, it cannot be said they had "no reasonable basis" for not introducing evidence of a purported alibi at trial; (4) Holmes cannot show that the testimony of the purported alibi witnesses, his family members, would have been helpful in establishing a defense at trial; and (5) the record established that Holmes waived his right to testify regarding his purported alibi at trial. ***See id.*** at 57-68.

- **Evidence Relating to the Cell Phone**: Finding trial counsel's testimony credible, the court found: (1) it could not conclude trial counsel had "no reasonable basis" for not presenting evidence relating to the cell phone; (2) Holmes's claim lacks arguable merit because trial counsel relied on the information obtained from the private investigator; (3) Holmes is unable to establish there was no reasonable basis for trial counsel's failure to present witnesses to testify regarding the cell phone; and (4) Holmes cannot establish he was prejudiced by trial counsel's failure to present witnesses, because none of the witnesses testified that they used the cell phone on the night of the murder. ***See id.*** at 69-73.

- **Commonwealth's Statements at Trial**:

o <u>Commonwealth's Statements Regarding Gun Violence</u>:

The court concluded: (1) it could not say that no reasonable basis existed for trial counsel's failure to object to the Commonwealth's comment regarding gun violence during opening statements because trial counsel explained that he was concerned that objecting to the statement would inflame the jury; (2) Holmes was not prejudiced because trial counsel were not required to object and, when viewed in context to the Commonwealth's whole opening statement, the court could not say there is a reasonable probability that the outcome of the trial would have been different with an objection; and (3) even if Holmes were prejudiced, the court instructed the jury that the arguments of counsel are not evidence, and we presume the jury properly followed the court's instructions. ***See id.*** at 73-83.

o <u>Commonwealth's Statements Regarding Frank Barndt</u>:

The court found: (1) the Commonwealth's statements relating to Barndt's plea deal were not offered as evidence of Holmes's guilt, but were instead offered to dispel any semblance of bias stemming from Barndt's testimony and reinforce Barndt's credibility; and (2)

Holmes cannot establish he was prejudiced because there was an overwhelming amount of evidence to enable a fact-finder to find him guilty of first-degree murder and criminal conspiracy. ***See id.*** at 84-92.

o Commonwealth's Hearsay Statements: The court found the testimony at issue duplicated evidence already admitted at trial and was therefore cumulative, and thus any error in connection with the admission of inadmissible hearsay was harmless. Further, assuming *arguendo* that the statements were hearsay without an applicable exception for admission as substantive evidence, Holmes was not prejudiced because the evidence of guilt was overwhelming. ***See id.*** at 93-97.

- **Witness Testimony Regarding Frank Barndt's Credibility**:

  o As to Holmes's claim that trial counsel were ineffective for failing to interview witnesses regarding Barndt's reputation, the court found that Holmes waived this issue by not raising it in his PCRA petition. Even if the issue had been preserved, it would be without merit, because trial counsel relied on the information obtained from the

private investigator who conducted an investigation and interviewed witnesses prior to trial. ***See id.*** at 97-99.

- o As to Holmes's claim that trial counsel were ineffective for failing to call witnesses to testify regarding Barndt's reputation at trial, the testimony would have been inadmissible at trial. In any event, Holmes cannot establish prejudice, because Barndt himself testified about how he had not always been truthful regarding his involvement in the homicide. ***See id.*** at 99-104.

Accordingly, we affirm on the basis of the cogent and thorough 105-page opinion authored by the Honorable Michael J. Koury, dated July 8, 2025, which we have attached for the convenience of the parties and for any additional appellate review.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/3/2026

- 13 -